**LUCAS, Collector of Internal Revenue, v.
KENTUCKY DISTILLERIES &
WAREHOUSE CO.**
Nos. 6366, 6367.

Circuit Court of Appeals, Sixth Circuit.
May 7, 1934.

S. E. Blackham, of Washington, D. C. (Thomas J. Sparks and Claude Hudgins, both of Louisville, Ky., and C. M. Charest and Elmer T. Kemper, both of Washington, D. C., on the brief), for petitioners.

H. H. Nettelroth, of Louisville, Ky. (Breed, Abbott & Morgan, of New York City, on the brief), for respondent.

Before HICKS and SIMONS, Circuit Judges, and HAHN, District Judge.

SIMONS, Circuit Judge.

The appeals are from judgments awarded a distiller against the collector of internal revenue for taxes assessed and paid under protest upon industrial alcohol, the loss of which by evaporation was determined after the effective date of the National Prohibition Law. The claims for refund were asserted under section 14, title 3, of the act (27 USCA § 84), and denied. The questions presented are whether section 14 applies to distilleries and bonded warehouses established under general laws prior to the passage of the act, or only to those thereafter operating under it; whether, if applied to pre-prohibition distilleries and warehouses, the section must necessarily be given retroactive effect; whether the distillery company which paid the tax was the taxpayer, or a mere volunteer without right to sue for recovery; and whether the rejection of the claims for refund by the Commissioner of Internal Revenue was an exercise of administrative discretion not subject to judicial review.

Both cases were tried to the court below without a jury, and, since the issues are identical, a single opinion will suffice. During 1918, 1919, and 1920, the appellee owned the premises at Louisville, Ky., known as the Elk Run Distillery and Bonded Warehouse No. 368. Its employee, Harry E. Wilkin, was the distiller of record, having filed the notices of intention to operate, claims for abatement, and claims for refund. The taxes here involved were assessed against him. Prior to the date of the armistice, November 11, 1918, in the one case, and prior to November 27, 1918, in the other, a large quantity of alcohol was manufactured at the distillery and stored in tanks 4 and 5 in preparation for withdrawal for munition purposes. Case 6366 relates to the alcohol lost in tank 5, and case 6367 to that lost in tank 4. Except for differences in respect to tank capacity, amount of alcohol stored, rate of withdrawal, and the amount of alcohol lost, the cases are not distinguishable on their facts.

The alcohol was gauged at the time it entered the tanks, but no regauge was made thereafter, and the amount of the loss was not ascertained until the tanks were emptied on November 3, 1919, in the one case, and on January 19, 1920, in the other. Upon being advised of the shortage, the Commissioner made assessments at the rate of $6.40 per gallon; that being the beverage alcohol rate. Claims for abatement having been filed, they were allowed for that portion of the tax which represented the excess over the nonbeverage rate of $2.20 per gallon. New claims for the rejected amounts were also disallowed. The taxes were then paid by the appellee under protest, claims for refund seasonably filed, and, upon their being rejected or ignored, the instant suits followed within the time provided by law.

The statutes involved are section 600 (a) of the Revenue Act of 1918, 40 Stat. 1105, printed in the margin,[1] and section 14, title

---

[1] "That there shall be levied and collected on all distilled spirits now in bond or that have been or that may be hereafter produced in or imported into the United States, except such distilled spirits as are subject to the tax provided in section 604, in lieu of the internal-revenue taxes now imposed thereon by law, a tax of $2.20 (or, if withdrawn for beverage purposes or for use in the manufacture or production of any article used or intended for use as a beverage, a tax of $6.40) on each proof gallon, or wine gallon when below proof, and a proportionate tax at a like rate on

3, of the National Prohibition Act, 41 Stat. 321 (27 USCA § 84) likewise so printed.[2] Prior to the passage of the National Prohibition Act, there was no provision by which taxes could be remitted or refunded for losses of alcohol through evaporation or leakage while stored in tanks, although the Carlisle Act, 28 Stat. 564, § 50 (see 26 USCA § 407 and note), provided for losses of spirits contained in casks, barrels, and other packages according to a table of loss allowances therein set up.

It will be noted that section 600 (a) of the Revenue Act of 1918 provides for the levy and collection of taxes on all distilled spirits in bond, but that the tax is to be paid by the distiller only when they are withdrawn. It will also be noted that section 14, title 3, of the National Prohibition Act, provides that, when any alcohol is lost by evaporation or other shrinkage, the Commissioner may remit or refund the tax incurred under existing law upon such alcohol, provided he is satisfied that it has not been diverted to any illegal use, and the claimant is not indemnified against such loss by insurance. The court found upon evidence which we deem sufficiently substantial, and in findings not challenged by specific exceptions or requests for contrary findings, that the loss upon which the claims for refund were based resulted from evaporation or other shrinkage, leakage, casualty, or unavoidable cause during storage, that none of it was diverted for any illegal use, and that neither the appellee nor the distiller of record was indemnified against the loss by insurance.

■ The first attack upon the judgments below is based upon the contention that the relief provisions of section 14 apply only to industrial alcohol plants and warehouses to be established and operated under section 2, of title 3, of the act (27 USCA § 72), as part of a new and comprehensive plan for the future control and regulation of the production and use of industrial alcohol for nonbeverage purposes, and not to pre-prohibition distilleries or warehouses. Principal reliance is upon section 2 of title 3, which provides that any person producing alcohol shall within thirty days after the passage of the act make application to the Commissioner for registration of his industrial alcohol plant, and shall thereafter be bonded and obtain permit for his operations. Other sections of the act also provide for control and regulation of distilleries or bonded warehouses established under the provisions of title 3. It is argued from this that none of the provisions of title 3 relate to existing industrial alcohol plants, that they are all prospective and not retrospective in character, and that the relief provisions of section 14 are not to be applied to losses in such distilleries. It is unnecessary to review the careful analysis made by the court below in its memorandum opinion of all of the provisions contained in title 3. It is sufficient to say that the general conclusion arrived at was that Congress in title 3 was clearly dealing with two kinds of bonded warehouse, one created under the express provisions of that title, and the other including warehouses generally, whether created under the National Prohibition Act or prior acts. An examination of these provisions, including sections 6, 9, 11, and 13, of title 3 (27 USCA §§ 76, 79, 81, 83), clearly supports that conclusion.

■ It is next contended that, since the loss was ascertained but a short time after the effective date of the National Prohibition Law, but a small part of it could have occurred since the enactment, and the greater part of it must have occurred prior to the enactment, and that to apply the relief provisions in section 14 to such loss requires retroactive effect to be given to that section which its terms do not with sufficient clearness either compel or permit. The court below clearly recognized the rule of statutory construction invoked, but held the application of section 14 to the disputed taxes did not require construing the statute as retroactive in effect. We agree with this conclusion. While it is true that all of the spirits stored in the tanks were subject to tax, no tax liability accrued under the terms of section 600 (a) until the alcohol was withdrawn, and no final ascertain-

---

all fractional parts of such proof or wine gallon, to be paid by the distiller or importer when withdrawn, and collected under the provisions of existing law."

2 "Whenever any alcohol is lost by evaporation or other shrinkage, leakage, casualty, or unavoidable cause during distillation, redistillation, denaturation, withdrawal, piping, shipment, warehousing, storage, packing, transfer, or recovery, of any such alcohol the commissioner may remit or refund any tax incurred under existing law upon such alcohol, provided he is satisfied that the alcohol has not been diverted to any illegal use: Provided also, That such allowance shall not be granted if the person claiming same is indemnified against such loss by a valid claim of insurance."

ment of tax liability could be made until the tank was empty. Whatever may have been the inchoate right of the government to tax the original quantity of spirits in the tank, the tax did not mature until the assessment and collection could be made.

The appellant contends that losses such as are here involved constitute withdrawal for tax purpose, citing United States v. Sisk, 176 F. 885 (C. C. A. 4); United States v. Witten, 143 U. S. 76, 12 S. Ct. 372, 36 L. Ed. 81; Hamilton v. Kentucky Distilleries & Warehouse Company, 288 F. 326 (C. C. A. 6); Corning Distilling Company v. United States, 66 Ct. Cl. 268. The cases cited are not controlling upon the issues involved. In the Sisk and Witten Cases the tax liability had matured by the lapse of time before any withdrawal of spirits, and the date of withdrawal and the circumstances under which withdrawn were immaterial. In the Hamilton Case, the tax obligation on stolen spirits matured after the effective date of the National Prohibition Law, and before the passage of the act of November 23, 1921, 42 Stat. 222, which exempted stolen spirits from tax. Since both statutes provided that the exemption might be allowed only to the extent that the claimant was not indemnified by insurance, and since the petition contained no averment that the claimant was not so indemnified, the precise question here involved was not presented by the record. Nor is the Corning Case authority for the appellant's position. The plaintiff there was a pre-prohibition distiller engaged in distilling spirits for beverage purposes, and had such spirits in its bonded warehouse when the Prohibition Act became effective, and the court there held that section 14, upon which reliance was had, was not directed toward the disposition of grain alcohol distilled prior to its effective date for purposes other than industrial.

We see no lack of soundness in construing section 14 as a remedial measure to be liberally construed in favor of the taxpayer. It is true that with the passage of the National Prohibition Act the Congress under the mandate of the Eighteenth Amendment entered upon a new governmental policy in relation to intoxicating beverages, and as a necessary incident in effecting its purpose it was required to provide additional controls and regulations for the production of nonbeverage alcohol to prevent its diversion to illegal channels. But it was not the purpose of the Congress to prevent the production of nonbeverage spirits, or to penalize those engaged therein. It was rather its express purpose, declared in the very heading of the act, "to insure an ample supply of alcohol and promote its use in scientific research and in the development of fuel, dye, and other lawful industries." The contention, therefore, that the relief provisions of section 14, as applied to industrial alcohol, must be denied liberal interpretation because of the purpose of the act to destroy alcohol as a beverage, is not persuasive.

The next contention for the collector is that the plaintiff below was a mere volunteer, and therefore not entitled to sue to recover the tax erroneously assessed. The record, however, shows that Wilkin was an employee of the Distillery, was operating its plant for it merely as its superintendent, and was designated as distiller for trade reasons only. The appellee owned the plant, paid for all the distillery operations, and was the sole owner of the alcohol, and this appears to have been known to the government. It seems to us clear that the appellee was not a volunteer. Had the tax not been paid and distraint proceedings begun, the appellee's property would have been seized to satisfy the tax claim. Wilkin had no interest in the property, and to protect itself from distraint the appellee was compelled to pay the tax, and its only remedy was to protest and to sue to recover it back. White v. Hopkins, 51 F. (2d) 159 (C. C. A. 5); Herman Aaron et al. v. Hopkins (C. C. A.) 63 F.(2d) 804; Cambria Steel Company v. McCoach, 225 F. 278 (D. C. Pa.). Moreover, Rev. St. § 3251, 26 U. S. C. § 249 (26 USCA § 249), imposes a joint and several liability for taxes on distilled spirits, upon every proprietor or possessor, and any person in any manner interested in the use of any still, distillery, or distilling apparatus, and impresses a lien on any land or buildings wherein such spirits are in existence. To say that the owner of land upon which the statute impresses a lien for taxes may not in discharging the lien question the validity of the tax requires a rather strained interpretation of his status as taxpayer.

The final contention of the collector that, because section 14 in respect to remitting or refunding taxes is permissive rather than mandatory, and conditioned upon his being "satisfied" that the alcohol has not been diverted to any illegal use, demonstrates an intention of the Congress to commit such refund to the sole discretion of the Commissioner, immune to judicial review, must likewise be rejected. The task here intrusted to the Commissioner is not one requiring the techni-

cal knowledge and experience, and ready access to data in the Bureau of Internal Revenue as was the task imposed on him by the special assessment provisions (sections 327 and 328) of the Revenue Act of 1918 (40 Stat. 1093). Nor is the language here employed, or the procedure described, such as led the court in Williamsport Wire Rope Company v. United States, 277 U. S. 551, 48 S. Ct. 587, 72 L. Ed. 985, to hold the exercise of the Commissioner's discretion final. The phrase "established to the satisfaction of the Commissioner" found in revenue legislation, which in effect is similar to that of the statute here involved, was fully considered in the recent case of Routzahn, Collector, v. Willard Storage Battery Company, 54 S. Ct. 443, 78 L. Ed. ——, announced February 12, 1934, and it was there said that only by inadmissible straining can it be held to invest the Commissioner with absolute authority or discretion in respect to refunds. A more rational view is that it is largely admonitive, and means that the elements upon which the Commissioner's action must be based are not lightly to be inferred, but to be established by proofs. A similar provision in the Customs Law of 1864 has been uniformly treated as neither investing administrative officers with final authority nor putting aside general provisions permitting suits for refund.

The judgments below are affirmed.